UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) Plaintiff, ) ) v. ) ) CITY OF NEW BERLIN, ) ) Defendant. ) ) | Civil Action No. |

**COMPLAINT**

The United States of America alleges as follows:

1. This action is brought by the United States to enforce the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended ("the Fair Housing Act" or "the FHA"), 42 U.S.C. 3601-3631.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C 1331, 28 U.S.C.1345 and 42 U.S.C. 3614(a).

3. Venue is proper under 28 U.S.C. 1391(b), because the events or omissions giving rise to the claims alleged herein occurred in the Eastern District of Wisconsin and because the defendant and the property at issue in this action are located there.

4. Defendant City of New Berlin ("New Berlin") is a Wisconsin municipal corporation, duly organized and operated as a city under Ch. 62, Wisc. Stat.

5. MSP Real Estate, Inc. ("MSP") is a corporation, organized and existing under the laws of the State of Minnesota, with its principal place of business in St. Louis Park, Minnesota.

6. New Berlin operates under the Mayor-Council form of government under Ch. 62, Wisc. Stat. At all times relevant to the Complaint, the duly elected Mayor of New Berlin has been Jack F. Chiovatero.

7. The New Berlin Common Council comprises eight elected officials, including the Mayor and seven members, each one representing New Berlin's seven Aldermanic districts. Among its duties, the Common Council reviews and approves developer's agreements, which are contracts entered into between a developer and New Berlin whenever a development application involves construction and maintenance of public infrastructure.

8. The New Berlin Plan Commission comprises seven members, including the Mayor, four citizen members appointed by the Mayor, one citizen member appointed by the Parks, Recreation and Forestry Commission, and one Alderman. Among its duties, the Plan Commission reviews and decides development applications for zoning permits and for use, site and architectural approval. The Plan Commission's decision on a development application is final and may be appealed to the New Berlin Board of Appeals.

9. The New Berlin Department of Community Development ("DCD") is responsible for administering New Berlin's zoning and planning functions. Among its duties, DCD makes recommendations to the Plan Commission on applications for zoning permits and for use, site, and architectural approval.

10. Chapter 275 of the Municipal Code of the City of New Berlin contains the zoning and land use requirements that apply to New Berlin ("Zoning Code"). The Zoning Code gives the Common Council the authority to change the zoning or land uses permitted in the Zoning Code by creating a Planned Unit Development ("PUD") district.

11. New Berlin is part of the Milwaukee-Waukesha Primary Metropolitan Statistical Area ("PMSA"). According to the U.S. Census Bureau, the Milwaukee-Waukesha PMSA is overall the most segregated region in the United States. The Census Bureau's 2005-2009 American Community Survey 5-year Estimates show that of New Berlin's approximately 39,000 residents, 95% are white and fewer than 1% are black. Of Milwaukee's approximately 603,000 residents, 49% are white and 38% are black.

12. There is a strong need for, and a short supply of, affordable housing in New Berlin and the surrounding housing market areas. New Berlin has three developments that provide affordable housing units for seniors but no developments that provide affordable housing for general occupancy or families. Approximately 41% and 49% of renters in New Berlin and in the Milwaukee-Racine-Waukesha Combined Statistical Area ("CSA"), respectively, are what the Department of Housing and Urban Development ("HUD") considers "cost-burdened," or paying more than 30% of their gross adjusted income to rent. New Berlin planning documents recognize the need for "workforce" housing, or housing for those lower-wage workers who work in New Berlin but who live in the surrounding communities. The waiting lists for other income restricted rentals in the CSA, which includes Waukesha and Milwaukee counties, span several years and have thousands of families waiting.

13. Black households are more likely to qualify for and need affordable housing than are white households in New Berlin and in the surrounding housing market areas. In New Berlin, black households are four times more likely than white households to qualify for affordable housing units for persons making 50% or less of the area median income. In

the CSA, black households are nearly six times more likely to qualify for affordable housing units for persons making 60% or less of the area median income. In the CSA, black households are four times more likely than white households to rent rather than own, and among renters, they are nearly two times more likely to be cost-burdened. Black households are disproportionately represented in other subsidized housing when compared to their representation in the overall population in the housing market. For example, approximately 15% of households in the CSA are black but 53% of households in HUD subsidized housing in this area are black.

14. In 2000, New Berlin approved a PUD for an area in New Berlin known as the City Center ("City Center PUD"). One of the stated purposes of the City Center PUD is to transform a commercially zoned area near the center of New Berlin into a mixed-use development area that includes a variety of retail and residential uses. The City Center PUD designates multi-family dwellings, including high-medium density residential ones, as a principal use.

15. The City Center contains a library, a medical office, four vacant retail buildings and three residential projects, which contain some unfinished and vacant units and which were approved and built after creation of the PUD.

16. In March 2010, MSP submitted a development application to construct 180 units of affordable housing in the City Center area of New Berlin at 14901 West Library Lane. One-hundred residential units were intended for seniors and 80 units were intended as general occupancy or workforce housing. All 180 units were designated as income restricted and reserved for persons earning no more than 40% to 60% of the area median

income. Because of the income restrictions, the monthly rents for the units were below market rate and ranged from approximately $550 for a one-bedroom to $1,100 for a three-bedroom, depending on household size and level of income.

17. As part of its proposal, MSP submitted a request for two waivers of the City Center PUD requirements related to parking. The waivers were to reduce the size and the number of parking spaces.

18. MSP's project was intended to be financed using state allocated tax credits under the Low Income Housing Tax Credit program ("LIHTC"), 26 U.S.C. 42 *et seq*. The LIHTC program provides federal tax credits to private developers as an incentive to create affordable housing. The tax credits are allocated in a competitive process to developers by the Wisconsin Housing and Economic Development Authority (WHEDA).

19. At the time of MSP's proposal, there were no applications pending or anticipated for development in the City Center. The last prior development proposal for the City Center was made in 2007.

20. On April 29, 2010, the DCD issued a recommendation that the Plan Commission approve with conditions MSP's development application to construct 180 units of affordable housing.

21. On May 3, 2010, the Plan Commission voted 4-3 to approve with 15 conditions MSP's application for use, site and architectural approval and a zoning permit ("May 3 approval"). The 15 conditions included, among other items, the requirement that MSP record a certified survey map and work with DCD staff to refine the architecture and

landscaping. The May 3 approval included the grant of the two requested parking waivers from the City Center PUD requirements.

22. On or about May 4, 2010, the local press reported on the May 3 approval. Immediately afterward, and over the next several weeks, city officials received numerous emails, calls, and other communications from residents of New Berlin, the large majority of whom voiced opposition to the May 3 approval and the MSP project. Some of the opposition was based in part on fear that the prospective tenants would be African American or minority. The Mayor, Aldermen, Plan Commissioners, and staff at DCD were aware that community opposition was based in part on race. The communications they received over several weeks contained express and implied racial terms that were derogatory and based on stereotypes of African American residents. These communications referenced "niggers," "white flight," "crime," "drugs," "gangs," "families with 10 or 15 kids," of needing "to get a gun," of "slums," of not wanting New Berlin to turn into "Milwaukee," of moving to New Berlin "to get away from the poor people," of not wanting to provide housing to people "who work but do not live here."

23. In the weeks following the May 3 approval, Mayor Chiovatero's residence was vandalized on several occasions. A sign that read "nigger lover" was placed in his yard. "Bigot" was spray painted on his driveway. "Leave or _ _ _" was written on his fence. Mr. Chiovatero and his family received threatening phone calls at his home residence. His children were approached by persons who opposed the Plan Commission vote, his car tires was slashed, and his car windows were shot through. The May 3 approval was

6

covered in the news and in some blogs. A citizen group launched a recall effort of the Mayor and appealed the May 3 approval to the Board of Appeals.

24. The public opposition put significant and sustained pressure on the Mayor, DCD staff, and the Plan Commissioners who voted in favor of the MSP project to find a way to reverse the decision. The Mayor wrote an email to a friend stating:

> I am a prisoner in my own home. I have spent several hours a day last week listening and replying to concerned citizens. . . . I was asked NOT to attend two functions this weekend for fear it would distract and cause havoc by my presence. Our City is filled with prejudice and bigoted people who with very few facts are making this project into something evil and degrading. . . . New Berlin is not ready, nor may never be, for a project like this. Unfortunately, I will be doing whatever is in my power to end this project, it will result in lawsuits and making New Berlin a community of bigots.

25. On May 14, 2010, the Mayor submitted a written request to the Plan Commission that he be permitted to reconsider his vote. The Mayor stated that the basis for his reconsideration was a concern about the parking waivers. The Mayor's motion was the first time a member of the Plan Commissioner had moved to reconsider his or her vote on a development application.

26. On or around May 28, 2010, the City Attorney and the Mayor proposed to MSP that the Mayor would agree to withdraw his request to reconsider if, among other terms, MSP agreed to remove all workforce housing from its proposal and build only senior housing. MSP refused the City's proposal.

27. On June 7, 2010, the Plan Commission voted unanimously in favor of the Mayor's motion to reconsider, rescinding the parking waivers. It postponed a revote on the MSP

7

project until the July 12 Plan Commission meeting and gave MSP a chance to submit revised plans.

28. Shortly after the Plan Commission vote, one Commissioner explained in an email:

> I am very conflicted when it comes to the vote today. . . . All the facts that Staff have given us is: yes, the land is zoned high density multi-family residential, and yes, the building meets the up-scale architectural design that we require. The waivers that were given have since been rescinded by the developer and they will not be requesting any reductions in parking. It has been made clear to me by New Berlin's legal counsel that our role is to vote only for "zoning and architecture" and NOT "what I want." Legally, we cannot reject the project on any basis of the demographics based on the Fair and Equal Housing Act. I have reached out to many . . . and no one has given me a reason that I should knowingly vote in a way that it is against the law.

29. On June 8, 2010, the Common Council unanimously adopted a 90-day moratorium on all future development applications and issuance of zoning permits, exclusive of the MSP proposal, in the City Center area. The stated purpose of the moratorium was to review portions of the New Berlin Comprehensive Plan related to the City Center and to review the City Center PUD. In an open statement, Alderman Ken Harenda explained that he had proposed the moratorium in part because he was against "[w]orkforce Housing for the City Center." The moratorium has been extended repeatedly and is still in effect.

30. On or around June 10, 2010, the Mayor wrote to WHEDA withdrawing his support for an award of tax credits for the MSP project. The Mayor withdrew his support in response to sustained pressure from citizen groups opposed to the MSP project. Notwithstanding the Mayor's withdrawal, and on June 18, WHEDA awarded $2.2 million in tax credits to MSP to build its affordable housing project.

31. After the Mayor moved for reconsideration, certain city officials pressured DCD staff to find a reason to recommend denial of the MSP project for the July 12 Plan Commission meeting.

32. On June 18, 2010, MSP submitted revised site plans without the two parking waivers and an explanation of how it had met the 15 conditions of the May 3 approval.

33. On July 2, 2010, DCD issued its staff report recommending that the Plan Commission deny the MSP project citing nine reasons. Of these, two concerned parking, six concerned architecture and landscaping, and one concerned an update to a storm water management plan.

34. On July 8, 2010, after receiving the July 2 staff report, MSP wrote a letter and met with DCD staff and other City officials to explain how it had already resolved or could resolve each of the nine reasons for denial in the staff report. MSP requested that officials table rather than deny its proposal.

35. On July 12, 2010, the Plan Commission voted unanimously to deny zoning approval for MSP's project. The Commission cited ten reasons. Nine of the ten reasons were issues MSP had been attempting to resolve with DCD or could have resolved with DCD with further discussion. Six of these were listed as conditions of the May 3 approval even though MSP had said it would comply with these conditions.

36. On July 14, 2010, the Mayor issued an open letter to all his residents stating that he had voted to deny the project on July 12 because of public opposition:

> In 2010, when the Section 42 Workforce housing came to public attention, it was clear that the nearby residents did not want this project to go forward. In support of the residents, I have since researched a means to halt the project. I am committed to focusing on what suitable options are available. The City Staff and I have

found justification for discontinuing the project and will now be focusing on alternatives.

37. Following the July 12 denial, and in the fall of 2010, MSP worked with New Berlin officials on an alternative plan to develop low-income housing on the same site as its original proposal. In October 2010, MSP gained ownership rights in a Limited Liability Partnership known as Deer Creek Homes ("Deer Creek LLP"). MSP proposed to use an existing zoning permit and developer's agreement that Deer Creek LLP had secured in 2004 and 2005 for the construction of 152 condominiums units on the same site. MSP intended to build the condominium units and rent the units out as low-income housing units with the same income restrictions and monthly rents specified in its original proposal.

38. By January 2011, MSP and City officials agreed to amendments to the original developer's agreement that would permit MSP to begin construction. On January 17, 2011, the Board of Public Works, which is the municipal board that reviews developer's agreements, voted to recommend approval of these amendments.

39. On January 25, 2011, the Common Council voted to deny the amendments to the developer's agreement. The Council's decision was the first time it had voted to deny a developer's agreement or amendment thereto. The Council's vote was contrary to the recommendation of the City Attorney, staff at DCD, and the Board of Public Works and was made in response to the opposition of persons who spoke against the proposal prior to the vote.

40. Between June 2010 and October 2010, and as part of the moratorium on development in the City Center, the City conducted citizen and business focus groups to determine whether to revise the Comprehensive Plan and City Center PUD.

41. As a result of these focus groups, and between February and April 2011, DCD planning staff and the Plan Commission recommended revisions to the 2020 Comprehensive Plan and the City Center PUD. Some of the revisions were made with the intent or effect of blocking MSP's proposal and other comparable affordable housing developments from locating in the City Center. These revisions include changes to requirements concerning height, density, the number of multi-family units permitted, land use, architecture and parking, among others.

42. The defendant's actions as described herein were taken because of race and because of community opposition that City officials understood to be based on the race and on racial stereotypes of the prospective tenants of affordable housing. Defendant's application of its zoning and land use laws have the intent and effect of discriminating against prospective black tenants and residents of New Berlin.

43. By the conduct set forth above in paragraphs 1-42, the defendant has (1) made dwelling unavailable or denied dwellings to persons because of race or color, in violation of 42 U.S.C. 3604(a); and (2) interfered with persons in the exercise or enjoyment of rights granted by 42 U.S.C. 3604, in violation of 3617.

44. Based on the foregoing conduct, defendant has engaged in:
    a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C. 3614(a); and

b. A denial to a group of persons rights granted by the Fair Housing Act, which denial raises an issue of general public importance, in violation of 42 U.S.C. 3614(a).

45. New Berlin's discriminatory conduct or actions as set forth above were intentional, willful, and taken in disregard for the rights of others.

46. MSP is an aggrieved person within the meaning of 42 U.S.C. 3602 (i) and section 3614(d)(1)(B). On information and belief, there are others who are aggrieved persons who have been or will be injured by defendant's actions.

WHEREFORE, the United States prays that the court enter an ORDER that:

1. Declares that the defendant's conduct, as alleged herein, violates the Fair Housing Act;

2. Prohibits the defendant, its officers, employees, agents, successors and all other persons in active concert or participation with it, from discrimination on the basis of race or color in violation of the Fair Housing Act, including further making unavailable or denying a dwelling because of race;

3. Requires that defendant approve MSP's proposal to build affordable housing at 14901 West Library Lane in New Berlin;

4. Requires that defendant take affirmative steps to comply with the Fair Housing Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of the defendant's unlawful housing practices as described herein;

5. Awards monetary damages, pursuant to 42 U.S.C. 3614(d)(1)(B), to all persons harmed by the defendant's discriminatory practices; and

6. Assesses a civil penalty against the defendant in an amount authorized by 42 U.S.C. 3614(d)(1)(C) to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

Dated: June 22, 2011

                  ERIC H. HOLDER, Jr.
                  Attorney General

| | |
|---|---|
| /s/ James L. Santelle | /s/ Thomas E. Perez |
| JAMES L. SANTELLE | THOMAS E. PEREZ |
| United States Attorney | Assistant Attorney General |
| Eastern District of Wisconsin | Civil Rights Division |
| | |
| /s/ Stacy C. Gerber Ward | /s/ Steven H. Rosenbaum |
| STACY C. GERBER WARD | STEVEN H. ROSENBAUM |
| LENNIE A. LEHMAN | Chief, Housing and Civil |
| Assistant United States Attorneys | Enforcement Section |
| Eastern District of Wisconsin | Civil Rights Division |
| 517 East Wisconsin Avenue, Ste. 530 | |
| Milwaukee, WI 53202 | |
| Phone: (414) 297-1700 | |
| Fax: (414) 297-4394 | |
| | /s/ Timothy J. Moran |
| | TIMOTHY J. MORAN |
| | Deputy Chief |
| | BURTIS M. DOUGHERTY |
| | Trial Attorney |
| | SAMEENA SHINA MAJEED |
| | Trial Attorney |
| | Housing and Civil Enforcement Section |
| | Civil Rights Division |
| | U.S. Department of Justice |
| | 950 Pennsylvania Ave., N.W |
| | Washington, D.C. 20530 |
| | Phone: (202) 305-1311 |
| | Fax: (202) 514-1116 |